IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CHANCE WILSON,** individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>**CONSUMER LEGAL GROUP P.C.**<br><br>**AND**<br><br>**PHOENIX DEBT PROS, INC.**<br>    *Defendants.* | Case No. 1:24-cv-02276<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

### FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Chance Wilson ("Plaintiff" or "Mr. Wilson") brings this First Amended Class Action Complaint and Demand for Jury Trial against Defendants Consumer Legal Group P.C. and Phoenix Debt Pros, Inc. ("Defendant(s)," "Consumer," or "Phoenix") and alleges as follows:

1. Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

2. "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal

government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.')…Private suits can seek either monetary or injunctive relief. *Id*…This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

3. The Plaintiff brings this action to enforce the consumer-privacy provisions of the TCPA alleging that Consumer and Phoenix violated the TCPA by making telemarketing calls to Plaintiff and other putative class members listed on the National Do Not Call Registry without their written consent as well as calling people who had previously asked to no longer receive calls.

## PARTIES

4. Plaintiff Chance Wilson is an individual residing in Nevada.

5. Defendant Consumer Legal Group P.C. is a corporation incorporated in Kings County, NY and having its principal place of business in this District.

2

6. Defendant Phoenix Debt Pros, Inc. is a telemarketer and lead generator that Consumer hired to generate leads for it. It is incorporated and has its principal place of business in Glendale, California.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 *et seq*.

8. This Court has general personal jurisdiction over Consumer because the company has its headquarters and principal place of business in this District. This Court has specific personal jurisdiction over Phoenix because it contracted with Consumer to place telemarketing calls nationwide on Consumer's behalf, including into New York.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the telephone calls at issue were orchestrated and sent from this District, and therefore a substantial part of the events giving rise to the claim occurred in this District.

## BACKGROUND

**A.   The TCPA Prohibits Calls to Numbers on the National Do Not Call Registry.**

10. The TCPA prohibits making multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c)(5).

11. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

12. A listing on the National Do Not Call Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

13. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers on the Registry and provide a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

## FACTUAL ALLEGATIONS

14. The Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

15. At no point did the Plaintiff consent to receiving telemarketing calls from the Defendants prior to receiving the automated calls at issue.

16. Plaintiff's telephone number, (805) XXX-XXXX, is a residential, non-commercial telephone number.

17. Plaintiff uses the telephone number for her own personal, residential, and household needs and reasons.

18. Plaintiff does not use the number for business reasons or business use.

19. The number is assigned to a residential telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses.

20. Plaintiff's telephone number has been listed on the National Do Not Call Registry since he listed it there in October 2023.

21. Plaintiff has never been a customer of Consumer and never consented to receive calls from Consumer.

4

22. The calls were made to pitch the Plaintiff to purchase Consumer's debt relief and other legal services.

23. Despite this, the Plaintiff received at least two calls from Phoenix placed as part of its relationship with Consumer on at least March 4, 2024 from the caller IDs 805-229-7119 and 805-485-2450.

24. Phoenix "spoofed" these caller IDs. That is, they forged them to hide the true origin of the call to appear as if it was coming from a local number, in this case, the 805 area code of the Plaintiff's own number.

25. Further evidence that the numbers are spoofed is also evident from the fact that they are unassigned to any subscriber.

26. For example, the 805-485-2450 number is a number that is owned by Ymax Communications Corporation. However, Ymax confirmed via response to a subpoena that that telephone number was not assigned to a customer at the time.

27. During the first call, which came from the "spoofed" caller ID 805-229-7119 and an individual pretending to be "National Debt Relief," the Plaintiff spoke to an individual named "Liam," and was transferred to an individual named "Claire," indicated that he was not interested and not to call.

28. The purpose of this call was to sell the Plaintiff debt relief and legal debt negotiation services, specifically "legal debt resolution."

29. It is believed and therefore averred that "Liam" and "Claire" are both employees of Phoenix.

30. Unsurprisingly, the Defendant Phoenix continued to call in order to sell Consumer's debt relief services. Specifically, *that same day*, the Plaintiff received another call

5

from the spoofed caller ID 805-485-2450. This individual also pretended to be calling from "National Debt Relief."

31. In addition to falsely claiming that they were from "National Debt Relief," and using a spoofed caller ID, this call used nearly identical scripting and transfer strategy as the first call that very same day, with the Plaintiff speaking to multiple individuals before being transferred to a so-called "closer."

32. The purpose of this call was also to sell the Plaintiff debt relief and legal debt negotiation services, specifically "legal debt resolution."

33. During that second call, the Plaintiff eventually spoke to another individual, a "closer" named "Roy Miller" who admitted that he was actually calling from Defendant Phoenix Debt Pros on behalf of Consumer Legal Group, not National Debt Relief, as originally claimed at the beginning of the call.

34. "Roy Miller" pitched the Plaintiff for about ten minutes on the benefits of enrolling in a debt relief plan with Defendant Consumer Legal Group.

35. "Roy Miller" sent the Plaintiff an email regarding "Legal Debt Resolution" and that he was the individual who would be "assisting" with the Plaintiff's "debt relief plan."

36. Subsequently, Mr. Miller emailed the Plaintiff and explained that Phoenix is a "management company partnered with Consumer Legal Group," and that Defendant Consumer doesn't "have the time and resources to handle the volume of in-coming calls."

37. Mr. Miller went on to explain, "Phoenix Debt Pros manages the enrollment process and filters the call volume for CLG using their portal."

38. It is believed and therefore averred that Defendant Phoenix used the "National Debt Relief" name during the call to protect Defendant Consumer Legal Group and avoid ill will

6

for its brand from cursory investigative efforts, not because it was actually calling for any company named "National Debt Relief."

39. The Plaintiff does not allege that an Automatic Telephone Dialing System (ATDS) or prerecorded voice was made to place the calls, nor does he have to. To be clear, the Plaintiff is suing under the TCPA's Do Not Call Registry prohibition in 47 U.S.C. § 227(c), not the automated call prohibitions found in 47 U.S.C. § 227(b).

40. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

41. In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

42. The FCC has instructed that sellers such as Consumers may not avoid liability by outsourcing telemarketing to third parties, such as Phoenix:

[A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

43. In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of

7

agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

44. Consumers is liable for telemarketing calls placed by Phoenix and transferred to Consumers and its agents to generate customers for Consumers and its agents, including the Plaintiff.

45. Consumers was interested in hiring a lead generator that could make phone calls to potential customers, vet potential clients, and only sell them the interested ones.

46. To do so, it hired Phoenix to orchestrate an *en masse* telemarketing campaign.

47. Indeed, by Mr. Miller's own admission, Consumers did not have the resources to conduct telemarketing on a mass schedule, so it hired Phoenix to filter out only the interested clients and send Consumers those who were interested.

48. Consumers controlled the day-to-day activities of Phoenix by providing the specific criteria for the leads it would accept and required its vendors, including Phoenix, to adhere to those criteria, as evidenced by Phoenix's own admissions.

49. Consumers also instructed Phoenix to attempt to salvage potentially interested customers by incessantly calling them again and again, and ignoring do not call requests, until such point as they confirmed that the buyer was interested in Consumers' services and Phoenix sent the consumers an email with a sales pitch.

50. Defendants did so despite numerous explicit indications that the Plaintiff was not interested and did not want any further calls.

51. As such, Consumers controlled the content of Phoenix's telemarketing.

52. It also could and should have communicated Plaintiff's multiple requests not to be called to Phoenix.

8

53. Phoenix, likewise, could and should have communicated Plaintiff's multiple requests not to be called to Consumers.

54. Finally, Consumers could have terminated Phoenix.

55. It did not.

56. By virtue of identifying the leads that they would accept and directing the conduct and other indicia of the calls at issue described above, Consumers directed the content of the communications that Phoenix would use in their calling.

57. A reasonable seller whose telemarketers are making calls would investigate into the reasons why they would be calling numbers on the National Do Not Call Registry and, moreover, individuals who already stated that they no longer wished to receive calls from Consumers or Phoenix.

58. Indeed, Consumers could have investigated if the transfers it received were on the National Do Not Call Registry.

59. It did not.

60. Consumers hired Phoenix without a proper investigation and did not terminate them when they were informed of Phoenix's illegal calling conduct.

61. As such, they knowingly ratified Phoenix's conduct.

62. Consumers also ratified Phoenix's conduct because, with knowledge of Plaintiff's complaints against Consumers and do not call requests to a Consumers agent, they accepted the Plaintiff's lead and ultimately sold the Plaintiff a policy.

63. Consumers accepted the Plaintiff's lead and then utilized it for a benefit by continuing to promote its services to him after he made clear he did not want the calls.

64. The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

65. The calls received by the Plaintiff were sent for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services as they seek to have him purchase Defendant Consumer's debt negotiation and legal debt relief services.

66. The calls received by the Plaintiff bore indicia that lead to the reasonable inference that they originated from the same place–Defendant Phoenix–and were placed as part of Phoenix's relationship with Consumer Legal, which by admission could not handle the screening and intake for the volume of calls Phoenix placed and thereby hired Phoenix to handle the initial calling, marketing, and screening on its behalf.

67. Plaintiff's privacy has been violated by the above-described telemarketing calls.

68. Plaintiff never provided his consent or requested these calls.

69. The aforementioned calls to the Plaintiff were unwanted.

70. The calls were non-consensual encounters.

71. Plaintiff and all members of the Class, defined below, have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed. In addition, the calls occupied their telephone lines, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

## CLASS ACTION ALLEGATIONS

72. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

73. Plaintiff brings this action on behalf of himself and the following class (the "Class") pursuant to Federal Rule of Civil Procedure 23.

> **National DNC Class:** All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of Defendants encouraging the purchase of Consumer's goods or services, (3) within a 12-month period (4) at any time in the period that begins four years before the date of filing this Complaint to trial.

74. **Numerosity**: The exact number of Class members is unknown but based on the *en masse* nature of telemarketing is believed to be at least hundreds of persons at this time, and individual joinder in this case is impracticable. Class members can be easily identified through Defendants' records, or those of their agents.

75. **Typicality**: Plaintiff's claims are typical of the claims of other Class members in that Plaintiff, and Class members, sustained damages arising out of Defendants' telemarketing calls and Class members sustained similar injuries and damages as a result of Defendants' uniform illegal conduct.

76. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with, or are antagonistic to those of, the Class, and Defendants have no defenses unique to Plaintiff.

77. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and members of the Class, and those questions predominate over

11

any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to, the following:

    a.    Whether Defendants obtained "prior express invitation or permission" under the TCPA, before the calls at issue;

    b.    Whether Defendants have established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the TCPA's do-not-call regulations;

    c.    Whether Consumers should be held liable for violations Phoenix may have made on its behalf; and

    d.    Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other Class members are entitled to treble damages under 47 U.S.C. § 227(c)(5).

78.    **Superiority**: Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.  There are hundreds of Class members, such that joinder of all members is impracticable.

79.    In addition to satisfying the prerequisites of FED. R. CIV. P. 23(a), Plaintiff satisfies the requirements for maintaining a class action under FED. R. CIV. P. 23(b) because:

    a.    The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Defendants;

b.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

c.     Defendants have acted or refused to act on grounds that apply generally to the proposed Class, thereby making final injunctive relief or declaratory relief herein appropriate with respect to the proposed Class as a whole; and

d.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I
### Violations of the TCPA, 47 U.S.C. § 227
### (On Behalf of Plaintiff and the National DNC Class)

80.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

81.    It is a violation of the TCPA to initiate any telephone solicitation to a residential telephone subscriber who has registered his or her telephone number on the National Do Not Call Registry. 47 C.F.R. 64.1200(c)(2).

82.    Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf violated the TCPA by causing multiple telephone solicitation calls to be initiated to Plaintiff and members of the National DNC Class in a 12-month period, despite the person's registration of his or her telephone numbers on the National Do Not Call Registry.

83.    These violations were willful or knowing.

84. As a result of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA's national do-not-call rule, Plaintiff and members of the National DNC Class are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

85. Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the National DNC Class, respectfully request that the Court enter judgment against Defendants for:

A. Certification of the National DNC Class as alleged herein;

B. Appointment of Plaintiff as representative of the Class;

C. Appointment of the undersigned as counsel for the Class;

D. Damages to Plaintiff and members of the National DNC Class pursuant to 47 U.S.C. § 227(c)(5);

E. Injunctive relief for Plaintiff and members of the National DNC Class, pursuant to 47 U.S.C. § 227(c)(5), preventing the Defendants from making calls to numbers listed on the National Do Not Call Registry;

F. Attorneys' fees and costs, as permitted by law; and

G. Such other or further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED AND DATED this 18th day of September, 2024.

*s/ Anthony I. Paronich*
Anthony I. Paronich
**PARONICH LAW, P.C.**
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
Fax: (508) 318-8100
anthony@paronichlaw.com

## **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

Dated: September 18, 2024

*s/ Anthony I. Paronich*
Anthony I. Paronich
**PARONICH LAW, P.C.**
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
Fax: (508) 318-8100
anthony@paronichlaw.com